## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | |
|---|---|
| JANE DOE, by her Natural Guardian and Legal Representative, FATHER DOE,<br><br>Plaintiff,<br><br>vs.<br><br>PAUL HERMAN, Individually; CYNTHIA MCBRIDE, Individually; NATE SPITULSKI, Individually; and BERKELEY COUNTY SCHOOL DISTRICT,<br><br>Defendants. | No. 2:15-cv-4757-DCN<br><br>**ORDER** |

This matter is before the court on defendants Cynthia McBride ("McBride") and Nate Spitulski's ("Spitulski")(collectively the "moving defendants") motion to dismiss plaintiff Jane Doe's ("plaintiff") claims against them pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, the court grants in part and denies in part the moving defendants' motion to dismiss.

## I.  BACKGROUND[1]

Plaintiff is a minor under the age of eighteen and was, at all times relevant to this action, a student at Goose Creek High School ("GCHS"). Am. Compl. ¶¶ 1, 51. At the beginning of the 2014-15 school year, plaintiff became aware of defendant Paul Herman ("Herman"), a school official employed by the Berkeley County School District ("BCSD")[2] as an Assistant Principal at GCHS. Id. ¶¶ 3, 49, 51. During the school year, Herman engaged plaintiff in intimate conversations on school grounds, in plain view of

---

[1]    The following facts are drawn from plaintiff's amended complaint.
[2]    The BCSD is a defendant in this action but is not involved in the instant motion.

other students and GCHS employees.  Id. ¶ 51.  On December 18, 2014, Herman told

plaintiff that he was sexually attracted to her, but warned her:  "If this were to ever get

out no one would believe you . . . ."  Id. ¶ 55.  Between December 2014 and February

2015, Herman engaged in a variety of public behaviors with plaintiff which plainly

demonstrated his prurient sexual interest in her, including:  (i) directing plaintiff into his

office, where he would kiss and touch her during and after school; (ii) replacing other

GCHS personnel in supervising school and extra-curricular activities involving plaintiff,

without offering any rational basis for such decisions; (iii) engaging plaintiff in intimate

conversations and making sexual comments to her on a daily basis, in public areas and in

plain view of other school officials; (iv) excusing plaintiff from her classes for no

disciplinary or educational purpose; (v) habitually waiting outside of plaintiff's

classrooms to speak with her when she exited class; and (vi) regularly watching plaintiff

on the school's surveillance cameras to track her movement and location.  Id. ¶ 53.

Privately, Herman also used his age and position to advance his prurient sexual interest in

plaintiff by telling her he could change her grades without regard to her academic

performance and threatening to suspend male students who spoke to her.  Id. ¶ 57.

From January to February 2014, Herman communicated with plaintiff by

telephone and sent her text messages discussing sexual and other inappropriate subject

matter.  Id. ¶ 59.  On Friday 20, 2015, Herman isolated plaintiff in his office and

subjected her to sexual battery.  Id. ¶ 58.  The next day, plaintiff's father ("Father Doe")

learned of the inappropriate telephone communications Herman was sending plaintiff,

and on Monday, February 23, 2015, Father Doe reported Herman to the Berkeley County

Sheriff's Office.  Id. ¶ 59.

The moving defendants were also employed as Assistant Principals at GCHS during the 2014–15 school year.  Id. ¶¶ 4, 5.  Spitulski's responsibilities included supervision, management, and control over the GCHS Teachers' Assistants ("TA") program, requiring him to supervise and investigate misconduct among students and employees in the TA program.  Id. ¶ 11.  McBride's responsibilities included acting as the GCHS Title IX administrator, requiring her to supervise, identify, and administer civil rights concerns among students and employees at GCHS.  Id. ¶ 10.  The moving defendants each had a general responsibility to observe GCHS student-employee interactions for inappropriate conduct.  Id. ¶ 13.  Specifically, BCSD policy required that:

> Any employee who believes that he/she has witnessed inappropriate conduct of a sexual nature toward an employee or a student must immediately report such a situation to his/her immediate supervisor or principal . . . . All administrators/supervisors/contact persons will initiate an investigation of any incident or alleged sexual harassment or inappropriate conduct of a sexual nature reported to them or observed by them in consultation with the district's Title IX Coordinator.

Id. ¶ 9 (citing BCSD Policy AR GBAA-R Employee Sexual Discrimination and Harassment- Issued 3/8/05; Revised 7/10/07).

Plaintiff alleges that the moving defendants became aware of Herman's sexual interest in plaintiff through first hand observations and their interactions with Herman. Id. ¶¶ 19, 22.  Plaintiff contends that the moving defendants observed Herman and plaintiff together for no educational reason throughout the school and in Herman's office on a daily basis and witnessed Herman frequently engage plaintiff in behavior deemed inappropriate under BCSD policy.  Id. ¶¶ 22, 24.  Despite these alleged observations, the moving defendants did not report Herman's misconduct or take any other action to prevent Herman from harming plaintiff.  Id. 19, 25–27.

Plaintiff further alleges that the moving defendants went beyond simply failing to intervene and actually enabled Herman's misconduct.  With regard to Spitulski, plaintiff alleges that Spitulski learned that Herman was concealing his misconduct toward plaintiff under the guise of the TA program and that Spitulski aided this concealment by telling BCSD officials and GCHS employees that plaintiff was Herman's TA, despite knowing that she was not.  Id. ¶¶ 31−37.  Plaintiff also alleges that Spitulski participated in certain of the conversations between herself and Herman, wherein Herman informed plaintiff that he could change her grades without regard to her academic performance.  Id. ¶ 38.  As for McBride, plaintiff alleges that McBride confronted Herman about the inappropriate amount of time he was spending with plaintiff in plain view of GCHS students and employees, and "directed [] Herman to conceal and hide his contact with plaintiff in private isolated settings at GCHS."  Id. 46, 47.

On the basis of these allegations, plaintiff filed this action on November 30, 2015.  The moving defendants filed the instant motion to dismiss on February 2, 2016.  Plaintiff filed a response, along with an amended complaint, on February 16, 2016.  The amended complaint brings causes of action under § 1983 against the moving defendants under a supervisory liability theory and a state-created danger theory.  The moving defendants filed their reply on February 26, 2016.  The court held a hearing on April 12, 2016.  The motion is ripe for the court's review.

## II.  STANDARDS

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss for "failure to state a claim upon which relief can be granted."  When considering a Rule 12(b)(6) motion to dismiss, the court must accept the plaintiff's factual allegations as true

4

and draw all reasonable inferences in the plaintiff's favor.  See E.I. du Pont de Nemours & Co. v. Kolon Indus., 637 F.3d 435, 440 (4th Cir. 2011).  But "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  On a motion to dismiss, the court's task is limited to determining whether the complaint states a "plausible claim for relief."  Id. at 679.  Although Rule 8(a)(2) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief," "a formulaic recitation of the elements of a cause of action will not do."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  The "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570).  "Facts pled that are 'merely consistent with' liability are not sufficient."  A Soc'y Without a Name v. Va., 655 F.3d 342, 346 (4th Cir. 2011) (quoting Iqbal, 556 U.S. at 678).

## III.  DISCUSSION

At the outset, the court must address plaintiff's argument that the amended complaint supersedes the previous complaint and renders the instant motion moot.  Pl.'s Resp. 2.  Although an amended complaint generally supersedes the original complaint, Young v. City of Mount Ranier, 238 F.3d 567, 573 (4th Cir. 2001), the amended complaint is not sufficient to moot the motion to dismiss in this case.  To the extent the amended complaint contains the same deficiencies addressed by the initial motion, the court may deem that motion to be made against the amended complaint.  Contreras v. Thor Norfolk Hotel, L.L.C., 292 F. Supp. 2d 798, 800 n.1 (E.D. Va. 2003) ("Although Plaintiff filed his Amended Complaint after Defendant's Motion to Dismiss was filed, a

pending motion to dismiss may be deemed against the amended complaint if the fatal

defects remain." (citing 6 Charles A. Wright et al., <u>Federal Practice and Procedure</u> § 1476

at 558 (2d ed. 1990)).  Here, the moving defendants' reply directs their original

arguments against the amended complaint.  Defs.' Reply 3.  Thus, the court will

"consider the motion as being addressed to the amended pleading."  <u>Id.</u> at 800.

Turning to the merits of the instant motion, the moving defendants argue that they

are entitled to qualified immunity from plaintiff's 42 U.S.C. § 1983 claims against them.

Defs.' Mot. 3.  In order to state a claim pursuant to 42 U.S.C. § 1983, a plaintiff must

allege (1) that he or she "has been deprived of a right, privilege or immunity secured by

the Constitution or laws of the United States," and (2) "that the conduct complained of

was committed by a person acting under color of state law."  <u>Dowe v. Total Action</u>

<u>Against Poverty in Roanoke Valley</u>, 145 F.3d 653, 658 (4th Cir. 1998) (citing 42 U.S.C.

§ 1983).  "Qualified immunity shields government officials from civil liability insofar as

their conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known."  <u>Hill v. Crum</u>, 727 F.3d 312, 321 (4th

Cir. 2013) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).  To determine

whether a defendant is entitled to qualified immunity, the court must examine whether

the defendant violated the plaintiff's constitutional or statutory rights, and if so, whether

the defendant's "conduct was objectively reasonable in view of the clearly established

law at the time of the alleged event."  <u>Id.</u>

The moving defendants argue that they did not violate plaintiff's rights under a

supervisory liability theory because they were not Herman's supervisors, and even if they

were, they did not possess sufficient knowledge or display the requisite "deliberate

6

indifference." Defs.' Mot. 4–10. The moving defendants also argue that did not violate plaintiff's rights under a state-created danger theory because they did not undertake any affirmative conduct which increased the risk of harm posed by Herman. Id. at 10–12. The court addresses each argument in turn.

A. **Supervisory Liability**

Plaintiff argues that the moving defendants are liable under a theory of supervisory liability because they were responsible for supervising Herman's interactions with plaintiff and failed to act to prevent Herman from abusing plaintiff, despite knowing of the risk Herman posed. Am. Compl. ¶¶ 64–78. The moving defendants contend that they did not have supervisory authority over Herman. Defs.' Mot. 4.

"[S]upervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates." Slakan v. Porter, 737 F.2d 368, 372 (4th Cir. 1984). To establish supervisory liability under § 1983, the court must find "(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices[;]' and (3) that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (quoting Slakan, 737 F.2d at 373, 376). Though the Fourth Circuit has stated that the plaintiff bears a "heavy burden of proof in supervisory liability cases," Slakan, 737 F.2d at 373, the question of supervisory liability is ordinarily an issue of fact, not law. Shaw, 13 F.3d at 799.

7

The moving defendants argue that plaintiff fails to allege that they had actual supervisory authority over Herman. As the Fifth Circuit explained in Doe v. Rains Cty. Indep. Sch. Dist., 66 F.3d 1402, 1415 (5th Cir. 1995), "supervisory liability" requires that the defendant's inaction be causally linked to the plaintiff's constitutional injury, and therefore, the defendant have had the ability to control the primary wrongdoer, otherwise "the causal connection between the failure to act and the ultimate injury [is] too speculative to support a finding of § 1983 liability." Moreover, because § 1983 liability is only imposed when a defendant acts "under color of state law," the defendant's control over the primary wrongdoer must arise from a power or right conferred under state law. Id. at 1411–13 (concluding that "it is state law's grant of a right of legal control over the immediate perpetrator of an injury that establishes that a state supervisor possessed and exercised state authority"). For this reason, "supervisory liability" is not strictly reserved for claims against direct supervisors, but a plaintiff must always show that the defendant possessed a state-law created right of control.[3] Id. at 1413 ("We have never suggested, however, that only supervisors can be held liable for a failure to act that results in a

_____

[3]    The court was unable to find any Fourth Circuit decisions explicitly addressing whether a "supervisory liability" theory may apply to non-supervisors. Notably, however, the Fifth Circuit's supervisory liability test is substantially the same as the test applied by the Fourth Circuit in Shaw. Compare Rains Cty., 66 F.3d at 1413 (finding liability "[w]here a supervisory school official (1) knew facts pointing plainly toward the conclusion that the subordinate was sexually abusing the student, (2) demonstrated deliberate indifference toward the student's constitutional rights by failing to take appropriate action to prevent or stop the abuse, the official can be held personally liable to the student if (3) the official's failure to act caused a constitutional injury to the student") (internal quotation marks omitted), with Shaw, 13 F.3d at 799 (requiring plaintiff to show "(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff."). Given the similarity between these two formulations of the supervisory liability doctrine, the court finds the principles announced by the Fifth Circuit in Rains County to be instructive on the issue.

constitutional injury. . . . While supervisors frequently have a right of control by virtue of their status, control can exist in other ways.").

The <u>Rains County</u> court went on to apply this rationale to the plaintiff's allegation that the defendant-teacher was liable under § 1983 for failing to report another teacher who was sexually abusing the plaintiff. <u>Id.</u> at 1416. The court found that a state statute requiring teachers to report child abuse to the proper authorities did not grant any right of control over the abuser. <u>Id.</u> Therefore, the defendant's failure to report the plaintiff's abuse under that statute "[did] not have the causal connection necessary to implicate an exercise of state power." <u>Id.</u> The court did note that if the defendant "otherwise possessed authority under state law—e.g., as a teacher or a citizen—to exercise control over [the abuser's] actions," she could have been held liable under § 1983. <u>Id.</u> at 1417. However, finding no such authority under Texas law, the court ruled that the defendant could not be held liable under § 1983 for her failure to report the abuse. <u>Id.</u>

Here, it is clear that the moving defendants were empowered—and indeed, required—to investigate and report inappropriate behavior and potential abuse, <u>id.</u> ¶¶ 9– 11, 13, 25, but this authority is entirely analogous to the reporting statute addressed in <u>Rains County</u>, and fails for the reasons discussed above. <u>Rains Cty.</u>, 66 F.3d at 1416; <u>Jennings v. Univ. of N.C. at Chapel Hill</u>, 240 F. Supp. 2d 492, 503 (M.D.N.C. 2002) ("In the absence of legal control over [the abuser], these [d]efendants' reporting omissions cannot be said to have affirmatively caused the alleged deprivation of [p]laintiffs' constitutional rights."). Beyond the power to investigate and report, plaintiff contends that Spitulski's authority to "supervise" the TA program and McBride's authority to "supervise" and "administer" Title IX matters gave the moving defendants supervisory

9

authority over Herman.  Am. Compl. ¶¶ 10, 11, 69, 70.  However, these allegations are simply too vague to suggest that the moving defendants could have controlled Herman's actions.  The fact that each GCHS assistant principal may have their own responsibilities and concomitant spheres of authority does not suggest that they have the ability to exercise anything resembling "control" over their fellow employees, especially those of equal rank.  Plaintiff has been unable to articulate what specific measures the moving defendants could have taken to prevent Herman's actions.[4]

Even assuming that the moving defendants could have established rules or policies through their TA program or Title IX authorities that would have addressed the risk Herman posed to plaintiff,[5] there is nothing in the amended complaint to suggest that state law gave them the power to unilaterally force Herman to comply with such requirements.  See Raines County, 66 F.3d at 1411–13 ("[I]t is state law's grant of a right of legal control over the immediate perpetrator of an injury that establishes that a state supervisor possessed and exercised state authority.").  This power would, presumably, lie with Herman's formal supervisor—the GCHS principal.[6]

Without this enforcement power, any TA program or Title IX-related rules or policies the moving defendants could have put in place would have had the same effect

---

[4]    When asked at the hearing what the moving defendants could have specifically done to control Herman, plaintiff's counsel first answered that they could have reported him to the principal, which is clearly insufficient under Rains County, as discussed above.  After further questioning, plaintiff's counsel again cited "supervisory" and "administrative" powers over the TA program and Title IX matters.  Of course, this simply restates, rather than resolves, the exact same ambiguity that prompted the questioning.

[5]    Alternatively, one might assume that such policies were already in place.

[6]    At the hearing, plaintiff's counsel appeared to suggest that GCHS's principal "delegated" his supervisory powers to the moving defendants to the extent those powers related to the TA program or Title IX matters.  This suggestion is nowhere to be found in the amended complaint, and even if it were, there is still nothing to suggest that this purported delegation was recognized under state law.

on Herman's actions as the aforementioned BCSD's sexual harassment policy—that is, the moving defendants could have reported Herman's violations to the principal, but the principal would have the ultimate authority to impose punishment or other enforce compliance.  See Am. Compl. ¶ 9 (citing BCSD Policy AR GBAA-R Employee Sexual Discrimination and Harassment- Issued 3/8/05; Revised 7/10/07).  As long as the moving defendants lacked this ultimate enforcement power, they did not possess the requisite "legal control" over Herman to be held liable under a supervisory liability theory.  Plaintiff's allegations regarding the moving defendants "administrative" and "supervisory" authorities can be read to implicate such power in only a vague and conclusory way, at best.

Therefore, the court finds that plaintiff has failed to plead sufficient facts to support a supervisory liability theory.[7]

### B.    State-Created Danger Theory

Plaintiff also contends that the moving defendants violated her  rights under a state-created danger theory.  Am. Compl. ¶¶ 79–90.  The moving defendants argue that they cannot be held liable under such a theory because they did not take any affirmative action which increased the risk of Herman's abuse.  Defs.' Mot. 9–12.

"[T]o establish § 1983 liability based on a state-created danger theory, a plaintiff must show that the state actor created or increased the risk of private danger, and did so directly through affirmative acts, not merely through inaction or omission."  Doe v. Rosa, 795 F.3d 429, 439 (4th Cir. 2015), cert. denied sub nom. 136 S. Ct. 811 (2016).  When

---

[7]    Because the court finds that the amended complaint fails to sufficiently allege that the moving defendants had the power to control Herman, the court does not address whether the moving defendants possessed sufficient knowledge of the risk Herman posed to plaintiff or whether the moving defendants displayed the requisite "deliberate indifference" to impose supervisory liability.

determining whether a state committed an affirmative act, courts must "resist the temptation" to allow inaction to be "artfully recharacterized as an action." Id. at 441 (quoting Pinder v. Johnson, 54 F.3d 1169, 1176 n* (4th Cir. 1995).

The bulk of plaintiff's amended complaint engages in this sort of "artful recharacterization." Id. Plaintiff's allegation that the moving defendants "failed to take steps to mitigate the risk that Plaintiff would be subject to [] Herman's" abuse, Am. Compl. ¶¶ 83, 85, fall well short of establishing the sort of "affirmative act" required under the "state-created danger" theory. Plaintiff does, however, allege two acts which require closer examination: (i) Spitulki's alleged lies to other GCHS employees, "informing" them that plaintiff was Herman's TA; and (ii) McBride's alleged conversation with Herman, in which she told him he was spending too much time with plaintiff "in plain view of GCHS students and employees," and "directed [him] to conceal . . . his contact with [p]laintiff." Id. ¶¶ 35, 45, 46.

Each of these alleged incidents could be characterized as "affirmative acts"—namely, communications. It is also at least plausible that these actions "increased" the danger to plaintiff by helping Herman to evade detection. Spitulski's statements could have resolved questions other GCHS employees might have had about Herman's behavior, and McBride's instruction to Herman to keep his contact with plaintiff private could have prevented such questions from arising in the first place. Thus, when read in the light most favorable to plaintiff, these allegations quite plainly state a claim that the moving defendants "increased the risk of [] danger." Rosa, 795 F.3d at 439.

This conclusion finds further support in the Fourth Circuit's opinion in Robinson v. Lioi, which recognized that a defendant may be held liable under the state-created

danger theory for actions which provide direct aid to the primary wrongdoer.  536 F.

App'x 340, 345 (4th Cir. 2013) (recognizing plaintiff's § 1983 claim against officer

where officer "affirmatively acted to interfere with execution of the warrant by

conspiring with [the primary wrongdoer] to evade capture and remain at large").  In

Robinson, a woman filed assault charges against her husband and a warrant was issued

for his arrest.  Id. at 341.  The defendant, an officer with the Baltimore City Police

Department, "withheld the warrant from the domestic violence unit that was responsible

for serving it[,] . . . warned [the husband] about the warrant[,] and sent him text messages

to help him avoid capture."  Id.  When the husband later arrived at police headquarters,

the defendant "refused to serve or arrest him, falsely claiming that the warrant could not

be found."  Id.  Eventually, the woman requested and obtained a protective order against

her husband, only to be attacked by him in broad daylight as she left the courthouse.  Id.

The woman later died of the injuries she sustained in the attack, and her children and

estate sued the officer under § 1983.  Id.

       In addressing the Robinson plaintiffs' state-created danger theory, the court found

that the officer's "affirmative acts in the conspiracy with [the husband] 'create[d] the

dangerous situation that resulted in a victim's injury.'"  Id. at 344 (quoting Pinder, 54

F.3d at 1177).  As such, the court regarded the officer's actions as having directly harmed

the victim.  Id. at 345.  The court emphasized that the officer's actions went beyond

simply failing to execute the arrest warrant—which would have been simple inaction;

instead, the officer "affirmatively acted to interfere with execution of the warrant by

conspiring with [the husband] to evade capture and remain at large."  Id.  Like the officer

in Robinson, McBride can be said to have "conspired" with Herman by allegedly

advising him to keep his interactions with plaintiff out of public view.  Similarly, Spitulski's alleged false statements to other GCHS employees may have covered up the impropriety of Herman's actions by offering some legitimate explanation for otherwise suspicious activities.

The court recognizes that there is some tension between plaintiff's state-created danger theory and the Fourth Circuit's statement in Doe v. Rosa that "[t]he 'concept of affirmative acts' should not extend 'beyond the context of immediate interactions between the [state actor] and the plaintiff.'"  Rosa, 795 F.3d at 439 (quoting Pinder, 54 F.3d at 1176 n*).  However, this statement was drawn from a footnote in Pinder v. Johnson which directs this instruction to "omission cases."  54 F.3d at 1176 n* ("[C]ourts should resist the temptation to inject this alternate framework into omission cases by stretching the concept of 'affirmative acts' beyond the context of immediate interactions between the officer and the plaintiff.").  Indeed, the Rosa court appeared to recognize this distinction when it addressed the aforementioned Robinson case.  Though the court did note that the Robinson case was unpublished, it also distinguished Robinson on the merits, stating that the conduct at issue in Robinson "was far more than a mere passive failure to act; the type of omission claim which the court rejected in Pinder."  Rosa, 795 F.3d at 442 (quoting Robinson, 536 F. App'x at 344) (emphasis added).  Thus, the Rosa court recognized the validity of its prior holding in Robinson, and confirmed that where a state actor engages in truly affirmative acts, such acts may give rise to liability on a state-created danger theory even if such acts occurred outside of the "immediate interactions between state actor and the plaintiff."  Id. at 441–42.  This interpretation of Rosa is not only consistent with Pinder and Robinson, but is also consistent with common sense; a

14

state actor, or any other person for that matter, can take any number of actions that would increase the risk of harm to others without actually interacting with them.

As discussed above, the amended complaint indicates that the moving defendants undertook such actions here.  Therefore, the court finds that plaintiff has alleged sufficient factual material to state a viable claim under the state-created danger theory.

## IV.   CONCLUSION

For the foregoing reasons the court **GRANTS** the moving defendants' motion to dismiss as to plaintiff's supervisory liability claims and **DENIES** the moving defendants' motion to dismiss as to plaintiff's state-created danger claims.

**AND IT IS SO ORDERED**.

_____
**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**June 10, 2016**
**Charleston, South Carolina**